Whitaker, Judge,
delivered the opinion of the court:
Plaintiff, a major in the Specialist Eeserve, Army of the United States, sues for retired pay, on the ground that the action of a retiring board and a disability review board, denying him retired pay, and the action of the Secretary of War, approving them, were arbitrary and capricious.
The facts have been set out in detail in the findings. We shall recite only such facts as seem pertinent to the determination of whether or not the action of these boards and the Secretary of War was arbitrary and capricious.
On January 27,1942, plaintiff, who was then an employee of the Standard Oil Company of California, on duty in Batavia, Java, was appointed a major in the Specialist Reserve, Army of the United States. He was assigned to duty in Bandoeng, Java. He was then 40 years old.
Prior to his commission, he was examined physically and found to be in good condition. Among other things, the *648 examining board reported that his arteries were normal. This is material because plaintiff claims that he has throm-boangiitis obliterans, which is the high-sounding term for the disease commonly known as “Buerger’s disease,” which is a disease of the blood vessels.
About ten days after plaintiff entered on active duty he tripped and fell while jumping into a trench during a bombing attack on Bandoeng, Java, injuring his right foot, an injury which plaintiff described as “just a sprained ankle.” However, after plaintiff had been transferred to Australia, there developed a numbness on the side of his right thigh. It is disputed whether or not there was any connection between the two. This was in April or May of 1942, three or four months after his entry upon active duty.
Some two years later, on March 14,1944, plaintiff applied for relief from active duty so that he might return to his former employment with the Standard Oil Company. In the meantime plaintiff had carried on his military duties without interruption. His superior officers recommended approval of this application and plaintiff was returned to San Francisco, California, where he was given a terminal physical examination on June 6,1944. During this examination he told the medical officers that he had experienced attacks of numbness in his right thigh, whereupon he was hospitalized. About three weeks later an Army Disposition Board recommended that he be sent before a retiring board. He appeared before the retiring board on September 26, 1944, which found that he was incapacitated on account of a disease “of the circulatory system, right lower extremity, manifested by diminished peripheral arterial pulsations and lowered skin temperature,” and that the cause of the incapacity was an incident of the service.
The Surgeon General, however, was of opinion that plaintiff was not incapacitated at that time, and recommended that he be given six months’ temporary limited duty and be further reexamined at the expiration of that time. Upon receipt of this recommendation, the Adjutant General returned the case to the Army Retiring Board for reconsideration of its findings.
*649 Upon reconsideration, tbis board found that plaintiff was not incapacitated for active service, but recommended that he “be considered for temporary limited service assignment for six months within the continental limits of the United States, and that he appear before a Disposition Board at the termination of that period.”
The Surgeon General concurred, and plaintiff was notified that the Secretary of'War had approved its findings except as to the recommendation for limited servicé, which was disapproved, because no suitable assignment for such service existed.
Plaintiff then, of his own volition, reported to the Pasadena ASF Eegional Hospital, Pasadena, California, where he remained until discharged on May 8, 1945.
Plaintiff made application for review by the Disability Beview Board, but the Judge Advocate General ruled he was not entitled to such a review.
Thus the matter stood until July 1951, when the plaintiff renewed his application for review of his case by the Disability Beview Board. The Judge Advocate General then reversed his previous ruling, and held that- plaintiff was entitled to such review.
Upon review by this board, on November 15, 1951, it was held in a three to two decision that plaintiff was permanently incapacitated for' active service, but that his incapacity was not the result of an incident of the service. They found that his incapacity was due to the disease known as “throm-boangiitus obliterans, right leg,” which, as stated, is commonly known as “Buerger’s disease.” This finding was approved by the Secretary of War.
The Disability Beview Board consisted of five members, two of which were medical officers. The majority, which held that plaintiff’s incapacity was not an incident' of his service, included the two medical officers. The minority were of opinion that the Buerger’s disease, with which all five members agreed plaintiff was afflicted, originated after his entrance on active duty in January 1942. The testimony of the medical experts, of whom there were four, two for the plaintiff and two for the defendant, was not definite on the probable date of its origin, and in other respects as well, and *650 in such a case the minority thought that the Army regulations required them to hold that the disease had been contracted after entrance on active duty. They relied particularly upon paragraph 2d of Army Kegulation No. 600-140, dated June 29,1951, reading as follows:
Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon entering active service or authorized training in an inactive duty status. In order to •overcome this presumption, it must be shown by substantial evidence that the injury or disease, or condition causing injury, disease, or death, was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an inactive duty status. * * *
The defendant, however, calls our attention to Army Regulation No. 40-1025, subparagraph (4) of paragraph 63 (g), the predecessor of the above-quoted regulation, which deals with the aggravation of a pre-existing disease. This sub-paragraph (4) provides in part:
* * * Also, incapacitating defects due to certain diseases, such as * * * arteriosclerosis, * * * and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of pre-existing conditions, and not incident to or aggravated by service. * * *
Attention is also called to paragraph 63 (g) (3) (AR No. 40-1025) upon which the minority relied, which reads in part:
* * * Manifestation of lesions or symptoms of chronic disease, so close to the date of the patient’s entrance into active service, that the disease could not have originated in so short a period, will be accepted as clear and unmistakable evidence that the disease existed prior to active service. * * *
Thromboangiitus obliterans, or Buerger’s disease, is hardly to be distinguished from arteriosclerosis, and the medical testimony of all the doctors is to the effect that ordinarily the *651 progress of both of these diseases is gradual, although the development of Buerger’s disease is somewhat more rapid than arteriosclerosis obliterans. The doctors were uncertain whether plaintiff’s disease was thromboangiitus obliterans or arteriosclerosis obliterans, but, whichever it was, it seems fairly clear that normally the onset is insidious and the progress is slow. Both diseases are chronic. Now, plaintiff entered upon active service in the latter part of January 1942, and first felt this numbness in his right thigh three or four months later; it was, therefore, reasonable for the Disability Review Board to conclude that the disease had not developed within those three or four months, but had existed prior to plaintiff’s entry upon the service.
Notwithstanding the fact that the progress of both arteriosclerosis obliterans and thromboangiitus obliterans is slow, the medical testimony nevertheless showed that an injury might accelerate the progress of the disease. Plaintiff relies on the sprained ankle, which plaintiff suffered ten days after his entry into the service, to show such acceleration. However, we think plaintiff’s counsel magnifies this injury. As stated above, plaintiff characterized it as “just a sprained ankle.” On cross-examination he was asked: “What were your symptoms when you felt this pain after the jump into the slit trench?” He answered: “I don’t recall any more symptoms than anyone would have turning your ankle walking out of this room.” The medical testimony attached but little significance to it.
Upon his discharge from the Army plaintiff resumed employment with Standard Oil Company at a salary of $10,000 per year, plus bonuses and allowances, which position he continued to hold for 5y2 years. At the time of his testimony in this case he was employed by the Department of Comr merce at $9,600 a year. Since his discharge he has drawn disability compensation from the Veterans Administration.
No citation of authority is necessary in support of the statement that the findings of fact of the Retiring Board and the Disability Review Board are conclusive, unless arbitrary or capricious. The Commissioner who heard the testimony of the witnesses and who made detailed findings of *652 fact, which evidenced careful and intelligent consideration of all the testimony, concludes that:
The findings and conclusion of the majority members, of the Army Disability Review Board were supported, by substantial evidence and were in accord with well . established medical principles. They were not arbitrary, capricious, unreasonable, or made in bad faith.
We thoroughly agree with this finding.
Defendant in its brief, for the first time, interposed the defense of statute of limitations. Since in this sort of a case this is a jurisdictional question, we should have considered this at the outset, but since it raises controversial legal questions about which there is some uncertainty, and since we are clearly of opinion that plaintiff is not entitled to recover on the merits, we have not discussed this issue.
It results that plaintiff is not entitled to recover and his-petition is dismissed.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a citizen of the United States and a resident of the State of California.
2. On January 27, 1942, the plaintiff, then an employee of the Standard Oil Company of California on duty in Batavia, Java, was duly appointed at the age of 40 years as Major, Specialist Reserve, Army of the United States. He took the oath of office at Bandoeng, Java, on January 28, 1942, and was immediately assigned to duty there. He remained on active duty and served honorably until February 17,1945.
3. The plaintiff had gone to Sumatra, Netherlands East Indies, as an employee of Standard Oil in June 1941, following a physical examination in March 1941 by the medical department of that company at San Francisco, California. He was found to be in good condition. There were no apparent physical disturbances in the lower extremities. The *653 plaintiff liad bad no symptoms referable to a circulatory ailment in bis legs.. Because no mention was made of any symptom, no special examination was made in this respect.
' 4. Prior to bis employment by Standard Oil, tbe plaintiff was an employee of the Shell Oil Company in Venezuela from 1926 to 1934. He then returned to California where be was self-employed for a year and a half as a sports promoter, particularly in baseball activities. Thereafter be was employed at Long Beach, California, by the Sunset Oil Company, as assistant general superintendent in charge of drilling and production, remaining until 1937 or 1938, when he became employed by Security Engineering Company in Whittier, California, serving there until his employment by Standard Oil.
5. On January 29, 1942, at Bandoeng, Java, the plaintiff underwent the usual physical examination of a newly appointed officer. The Army medical officer found the plaintiff to be in good condition and, among other observations, reported the following: “Arteries: Normal. Varicóse veins: None.” The plaintiff made no complaint of any symptoms because he had experienced none. The examination was in general thorough, but was superficial with respect to the condition of the arteries. A mild arterial disease could have existed without being detected.
6. Upon taking his oath of office, the plaintiff was assigned to duty as Headquarters Commandant, Ear East Air Force Headquarters, Bandoeng, Java. Among other things, he was in command of the military police, including units of British, Australian, Dutch, and American forces.
While on duty at Bandoeng, the plaintiff and the armed forces were repeatedly subjected to bombing attacks by Japanese aircraft. They evacuated that post on February 26,1942, and traveled by boat to Freemantle, Australia, arriving there about March 4,1942. The plaintiff proceeded to New Guinea on further duty and then to Melbourne, Australia, remaining there from about March 16,1942, through May of that year.
7. On February 6 or 7, 1942, about ten days after he had entered on active duty, the plaintiff tripped and fell while jumping into a slit trench during a bombing attack at Ban-doeng, Java. He sustained an injury to his right foot or *654 ankle, wbicb caused Mm to limp, and for wMch lie was treated at the dispensary by a medical officer and returned to duty. The plaintiff testified that his injury was “just a sprained ankle” and that he experienced no numbness in his leg at that time.
The plaintiff first noticed a numb area on the side of his right thigh about April or May 1942, while in Australia. This disorder was later diagnosed as meralgia paresthetica, apparently not related to a circulatory ailment.
8. Under date of March 14,1944, the plaintiff in Australia made written application through channels to the Adjutant General, Washington, D. C., for relief from active duty to be accomplished at San Francisco, California, in order to return to his employment with Standard Oil in a position similar to the one he held at the time of his appointment as an officer. His service in the Army had included one month in Java, three months in New Guinea, and the balance of the time in Australia. His superior officers recommended approval of his application and certified that there was no present assignment available for him in the theater of operations and that in any event he was scheduled to be returned to the United States in the near future under the existing rotation policy.
The plaintiff was thereafter returned to San Francisco, California, where on June 6, 1944, he was given a terminal type physical examination. He advised the medical officers that during the past two years he had experienced attacks of numbness and burning on the side of his right thigh. They recommended that he be admitted to Letterman General Hospital for further study and disposition. The plaintiff had been hospitalized in Australia for a kidney infection not related in any way to any of the symptoms noticed with respect to his leg, for which he had neither sought nor received treatment.
9. On July 3, 1944, the plaintiff was ordered to report to the Army’s Letterman General Hospital, San Francisco, California, “for observation, treatment and recommendation for type of duty, if any, that he may be qualified to perform.” On July 16, 1944, his condition was diagnosed as follows:
*655 • 1) Metatarsalgia, right foot, chronic, moderate, cause undetermined.
2) Meralgia, paresthetica, chronic, moderate, cause undetermined.
3) Vascular system, other diseases of, characterized by organic occlusion of the arteries of the right lower extremity, chronic, moderate, cause undetermined.
The vascular consultation report at that hospital, dated July 11, 1944, stated in pertinent part as follows:
This 42-year old officer states that in February 1942, he injured the right foot when he threw his weight on the foot in a sitting position while jumping into a slit trench in J ava. Had the foot strapped in a dispensary but it was painful to walk on and it became especially more painful about three weeks after the injury when he had to carry his barrack bag and other belongings a considerable distance. Pain in the longitudinal and metatarsal arch regions has continued since that time, the pain coming on after he has walked more than a few blocks. It is of a cramp-like nature and is relieved by taking the weight off the foot and resting two or three minutes, or even more rapidly by plantar flexing the toes at rest. He states that the pain does seem related to the thrust in walking. About 4 months after the injury he was transferred from J ava to Melbourne, Australia, where, in this colder weather, he noticed that the right foot became cold much more readily and quickly than the left and took longer to warm up. Both this tendency to get cold and the pain on long standing or exercising have tended to remain about the same. There has never been any unusual amount of cramps in the calves of the legs, and there has never been any difficulty with the left foot. Aching and burning in the region of the right thigh came on in 1943 and have not seemed to him to be related to the other disability.
10. From Letterman General Hospital, the plaintiff was ordered to proceed to the Army’s DeWitt General Hospital, Auburn, California, for further observation and treatment, and was admitted on July 16, 1944. There an Army disposition board concluded on July 27,1944, that the plaintiff had a disease of the circulatory system, right lower extremity, manifested by diminished peripheral arterial pulsations, lowered skin temperature and plantar ischemia. The board stated its opinion that the plaintiff was perma- *656 xiently unfit for general service, but qualified for limited service in the Army. It recommended that the plaintiff appear before an Army retiring board with a view to assignment to permanent limited service within the continental limits of the United States and not involving prolonged standing and walking.
11. On August 19, 1944, the plaintiff was ordered to the Army’s Hammond General Hospital, Modesto, California, for purpose of appearing before an Army retiring board.
On September 26, 1944, a duly constituted Army retiring board convened and heard the plaintiff’s case. After hearing the plaintiff and two medical witnesses and examining medical records, the board found as follows:
That Major Hugh E. Thompson, 0888013, TC, is incapacitated for active service.
That said incapacity is the result of an incident of service.
That the cause of said incapacity is: Other diseases of the circulatory system, right lower extremity, manifested by diminished peripheral arterial pulsations and lowered skin temperature.
That the cause of said incapacity is an incident of the service.
That said incapacity originated on or about April 1942.
That said incapacity is permanent.
12. Under date of October 10,1944, the Surgeon General’s Office, by letter advised the Adjutant General that it did not concur in the findings of the Army retiring board in the plaintiff’s case, and recommended that the record be returned to the board for reconsideration of its findings. The letter stated in part as follows:
3. The record reveals that this officer was hospitalized for hyperasthesia of the outer aspect of the right thigh corresponding to the distribution of the lateral femoral cutaneous nerve and the oscillometric readings and decreased temperature were noted at this time but there were apparently no other symptoms at this time. It is the opinion of this office that in view of the above that this officer does not qualify for the definition of the word incapacity as defined in Alt 605-250, Section IV, paragraph 30, and as such should be found not incapacitated at this time and recommended for 6 months’ temporary limited duty with reexamination at a general hospital at the expiration of that time for reevaluation.
*657 13. Under date of October 20,1944, the Adjutant General returned the record of proceedings to the Army retiring board, together with a copy of the Surgeon General’s letter, and stated that it was desired that the board reconvene for reconsideration of its findings.
On the same date, the plaintiff was ordered to proceed from his home in Alhambra, California, to Hammond General Hospital for further observation and treatment. A previous order dated October 2,1944, which placed the plaintiff on terminal leave and provided for his release from further active duty to revert to an inactive status, effective November 22,1944, was revoked.
14. On November 10,1944, the Army disposition board at the Hammond General Hospital, to which the plaintiff had been readmitted on October 26, 1944, considered the plaintiff’s case. The board reviewed the medical record of the plaintiff, conducted a physical examination of him, and stated its diagnosis as follows:
Other diseases of the circulatory system, right lower extremity, manifested by diminished peripheral arterial pulsations and lowered skin temperature.
The board stated its opinion that maximum hospital improvement had been attained, that the plaintiff was physically unfit for general service, but fit for temporary limited service, and recommended that the plaintiff be returned to temporary limited service within the continental United States, not with field troops, to be reexamined May 10,1945, to determine fitness for general service.
15. On November 14, 1944, the Army retiring board reconvened, with replacements for two of the five-member panel which held the original hearing, to reconsider the plaintiff’s case. The plaintiff was present and participated in the proceedings. Upon considering the recent proceedings and opinion of the Army disposition board, and after hearing further testimony with respect to the fitness of the plaintiff for limited service, the Army retiring board found and recommended as follows:
That Major Hugh E. Thompson, 0888013, TC, is not incapacitated for active service.
*658 The board recommends that Maj. Hugh E. Thompson be considered for a temporary limited service assignment for six months within the continental limits of the United States, and that he appear before a Disposition Board at the termination of that period.
16. On November 14,1944, the plaintiff by telegram to the Adjutant General advised that the reconvened Army retiring board had recommended that he be considered for temporary limited service and re-examination at the expiration of six months, and requested that his relief from active duty be held in abeyance.
17. The proceedings of the Army retiring board which convened on September 26, 1944, and reconvened on November 14, 1944, were reviewed in the office of the Surgeon General, and that office, on November 30, ,1944, advised the Adjutant General that it concurred in the foldings of the reconvened board that the plaintiff was not incapacitated for active service.
Under date of January 12, 1945, the plaintiff was advised by letter from the Adjutant General that by direction of the Secretary of War the findings of the Army retiring board, dated November 14, 1944, in the plaintiff’s case, were approved except as to the recommendation for limited service, which was disapproved.
18. On January 22,1945, the plaintiff was ordered released from duty assignment at Fort Mason, California, was granted 24 days’ terminal leave, was directed to proceed to his home at Alhambra, California, to arrive not later than February 17, 1945, on which date he would be released from further active duty and would revert to an inactive status.
It was stated in the order that his release from active duty was because no suitable assignment existed. It was further provided that his temporary appointment in the Army of the United States would continue in force during the present emergency and until six months thereafter, unless sooner terminated by direction of the President.
19. On February 6,1945, by telegram to the Surgeon General, the plaintiff made reference to the recommendation dated November 14, 1944, of the reconvened Army retiring board that he be placed on limited service and reexamined in May 1945, advised of the recent order of the Adjutant *659 General relieving him from active duty, and stated that he had requested the Adjutant General to rescind the order for release so that active duty status could be retained and suitable treatment or disability allowances be made. He stated that no answer had been received, and requested immediate telegraphic reply.
20. By telegram transmitted February 20,1945, the Adjutant General replied to the plaintiff’s telegram to the Surgeqn General, stated that a complete review of the plaintiff’s case disclosed that he was physically qualified for general military service, and that in the event the plaintiff desired further hospitalization, he should make application to the Adr-ministrator of Veterans’ Affairs. It was further stated that the. request for retention on active duty was not favorably considered.
In the meantime, the plaintiff on February 15, 1945, had voluntarily reported to the Pasadena ASF Regional Hospital, Pasadena, California, where he remained until discharged on May 3,1945.
21. By letter dated March 2, 1945, the plaintiff outlined his case to the Inspector General, and requested consideration and advice as to liability of the Government. This letter was forwarded through channels to. Headquarters, Ninth Service Command, Fort Douglas, Utah, which requested the Pasadena Hospital to make a determination as to whether the physical condition of the plaintiff was the same on February 15, 1945, as at the time of the action of the reconvened Army retiring board on November 14, 1944.
The Pasadena Hospital on March 26, 1945, reported to the Ninth Service Command that its orthopedist was of the opinion that the plaintiff’s vascular disease had probably become worse in the last few months, but that no facilities were available for quantitative evaluation of the condition and no comparison could be made with the previous findings. It further reported that the plaintiff had been admitted for observation and was under no definitive treatment, and that the plaintiff believed his symptoms to be somewhat more severe than on previous hospitalization. It recommended the transfer of the plaintiff to a vascular center if reevaluation of physical status was required for administrative disposition.
*660 The Ninth Service Command thereupon recommended to the Adjutant General, by letter dated March 31, 1945, that the plaintiff be recalled to active duty, that a review of the officer’s condition be authorized, and that he again appear before an Army retiring board if it be determined that his condition had become aggravated.
This recommendation was referred by the Adjutant General to the Surgeon General who advised on April 19, 1945, that the plaintiff’s case had been again reviewed, that the findings of the Pasadena Hospital were apparently the same as those of the DeWitt General Hospital in July 1944, and recommended that the plaintiff’s request for further study at a vascular center be denied. It was suggested that the plaintiff be informed as to his rights in filing a claim with the Veterans’ Administration.
22. Following the plaintiff’s release from active duty and his discharge from the Pasadena Hospital, the plaintiff was reemployed as an equipment engineer by the Standard Oil Company of California in its foreign service department. The Standard Oil recognized that his physical condition would not permit strenuous activity and might not permit him to be used for foreign service. His position contemplated the type of work which he had performed prior to his commission as an officer, that is, walking about construction or drilling projects in the field to check equipment, and operating and maintaining warehouses for stocks of material. This work was comparable in physical activity to the services performed by the plaintiff in the Army. He was kept in San Francisco for six months under observation by his employer, and then sent to South America where his work was considerably restricted. His assistant handled the surveying and maintenance of warehouses. He took considerably more time than normally necessary in walking about the projects. He was kept near headquarters in order to be available for medical assistance. Except for five or six airplane trips back to the United States for business reasons, the plaintiff remained in Venezuela from 1946 until late 1950, when a company doctor advised him to return to San Francisco for medical treatment, where Standard Oil sent him to Dr. Norman E. Freeman, vascular surgeon, on December 28,1950.
*661 At the time of the trial of this case, in 1953, he was employed at a desk job in the Petroleum Division of the Department of Commerce. He testified that he could then walk only between 150 to 175 paces before he would experience cramps in his leg or numbness in his feet, and that the condition had been progressing. In 1944, he could walk about-300 paces at a cadence of 100 per minute before the cramps started.
23. In January 1951 the plaintiff was admitted to Franklin General Hospital at San Francisco, California, as a patient of Dr. Freeman, for the purpose of having studies made of his condition, all under the sponsorship of Standard Oil.
On January 4,1951, Dr. Freeman performed an exploratory operation, known as a femoral arteriogram, which consisted of an incision in the right thigh just below the groin to disclose the femoral artery, and the injection into the artery by means of a needle of an iodine compound known as diodrast to aid in visualizing the arteries in the leg. Dr. Freeman observed that the artery was soft and not sclerotic at the place of injection. The arteriogram indicated that there were a number of the branches of the main artery in the leg which were blocked, which might have been due to either Buerger’s disease or arteriosclerosis, and that there had been a development of tortuous collateral blood vessels indicating dilation of smaller vessels to form a by-pass around each obstruction. That night the plaintiff developed acute thrombosis or blood clot in the artery where it had been subjected to injury from injection of the diodrast. An immediate operation was performed, and the blood clot was removed.
On January 19, 1951, Dr. Freeman performed a lumbar sympathectomy on the plaintiff, which operation consisted of an abdominal incision with removal of the nerves which cause the blood vessels in the right leg to constrict. The beneficial result desired and attained was that the right leg became warmer. At this time, Dr. Freeman diagnosed the plaintiff’s condition as Buerger’s disease.
In his report to the medical department of Standard Oil, dated January 29, 1951, Dr. Freeman commented on the plaintiff’s case in part, as follows.:
*662 The X-ray findings are certainly compatible with the diagnosis of Buerger’s disease. Mr. Thompson stopped smoking entirely the day of the arteriogram and I think that his prognosis is good provided that he abstains permanently from the use of tobacco in any form. The femoral artery was not thickened or sclerotic at the time that it was exposed for the arteriogram, so that I do not believe that arteriosclerosis is a likely possibility.
On July 7, 1953, Dr. Freeman again examined the plaintiff, and on July 20 next, appeared as a witness in behalf of the plaintiff in the trial of this case. He then stated that while it was still possible that the plaintiff had Buerger’s disease, the evidence now leads him to favor arteriosclerosis. He further stated his reasons to be that the plaintiff had stopped smoking entirely, but in spite of this, the recent examination showed evidence of further impairment of the arteries, now involving the left leg, and the disease had progressed since January 1951.
24. Under date of June 5,1952, the Veterans’ Administration advised the plaintiff that on the evidence submitted, including the recent physical examination, it was shown that the plaintiff was 20 percent disabled by reason of service-incurred Buerger’s disease from February 18, 1945, the date following his discharge from military service, to January 29,1952, and 50 percent disabled from January 30,1952. It was stated that the plaintiff was entitled to monthly compensation of $23 from February 18, 1945, $27.60 from September 1, 1946, $30 from December 1, 1949, and $75 from January 30,1952. The plaintiff has been and is now receiving such compensation from the Veterans’ Administration.
25. The plaintiff in June 1945 made application for review of his eligibility for disability retirement. On June 27,1945, the Judge Advocate General ruled that his case could not be considered by the Army Disability Beview Board because he had not been released to inactive duty for physical disability. On July 10,1951, in response to plaintiff’s renewed request for review made in July 1951, this ruling was changed, and the plaintiff’s case was held subject to review.
On November 15,1951, the Army Disability Beview Board convened at Washington, D. C. (Pursuant to Section 302, Public Law 346, 78th Congress, approved June 22, 1944, 58 *663 Stat. 287, as amended by Section 4, Public Law 268, 79th Congress, approved December 28, 1945, 59 Stat. 623) and heard the plaintiff’s case. Plaintiff was present in person and represented by counsel. The board reviewed the medical and hospital records of the plaintiff, considered the administrative actions taken by the Army, and received affidavits. In response to questions propounded by his attorney and by members of the board, the plaintiff testified in detail and at length, as did Dr. J. Loss Yeal, a vascular surgeon who had previously examined the plaintiff. Dr. Yeal testified that the plaintiff was suffering from throm-boangiitis obliterans, or Buerger’s disease, that he was from 50 to 75 percent incapacitated, and that his disability was permanent. He further stated his opinion that the onset of Buerger’s disease is abrupt, occurring within a matter of hours or days, or that the pathology and symptoms of the disease fairly closely coincide, and that the onset of the plaintiff’s vascular disease was in April 1942 when he first noticed symptoms.
During the proceedings, the plaintiff demonstrated to the members of the board both his feet in the dependent and elevated positions. The members took notice of the vasomotor changes and also the condition of the toe nails on both feet. The examination by the two medical members was confined to observation and palpation of both major and minor dependent extremities.
26.' On November 15, 1951, after deliberation in closed session, the Army Disability Beview Board, by a majority of three (including the two medical officers) of the five members, made the following written findings and conclusions :
1. That Major Hugh E. Thompson, 0888013, TC-AUS, is permanently incapacitated for active service.
2. That said incapacity for active service is not the result of an incident of service.
3. That the cause of said incapacity is: Thrombo-angiitus Obliterans, Bight Leg.
■ 4. That the cause of such incapacity is not an incident of service.
5. That the date of origin of the incapacitating defect is prior to entrance upon active service.
*664 6. That officer became incapacitated for active service on or about the month of July 1944.
7. That the cause of such incapacity has not been permanently aggravated by military service.
8. That officer’s disability was not incurred in combat with an enemy of the United States and did not result from the explosion of an instrumentality of war in line of duty.
Conclusions: That the symptoms complained of and the physical findings recorded while in active service are recurring episodes of a pre-existing disease, are not beyond the natural progress thereof, and do not constitute permanent aggravation.
The two dissenting members wrote an extensive minority report in which they stated that they were firmly of the opinion that the plaintiff’s Buerger’s disease originated subsequent to his entrance on active duty in January 1942, that there was no evidence of any symptoms prior to that time, that his first symptoms occurred in April 1942, that the onset of the disease could be insiduous or acute, and that the plaintiff was entitled to the presumption contained in Army Eegulation 600-140, 29 June 1951, paragraph 2d, as follows:
Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon entering active service or authorized training in an inactive duty status. In order to overcome this presumption, it must be shown by substantial evidence that the injury or disease, or condition causing injury, disease,_ or death, was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an inactive duty status. * * *
The ultimate findings of the two minority members differed from those of the majority in that they stated that the plaintiff’s incapacity for active service was a result of an incident of the service, that the cause of such incapacity was an incident of the service, and that the date of origin of the incapacitating defect was subsequent to entrance upon active duty.
27. The action taken by the Army Disability Eeview Board was approved, by direction of the President, by the Adjutant General on November 15,1951.
28. By letter dated December 20, 1951, the Adjutant General advised the plaintiff in part, as follows:
*665 As a result of Army retiring board proceedings, it was found that you were not permanently incapacitated for active service. Upon review in the Department, this finding was approved.
In consideration of your application, the Army Disability Eeview Board, established under authority of Section 302, Public Law 346 — 78th Congress, approved 22 June 1944, has carefully reviewed the findings and decisions of the Army retiring boards and the subsequent administrative action in your case. The Secretary of the Army has instructed me to advise you that as a result of this review, you are considered to be permanently incapacitated for active service and that the incapacity is not the result of an incident of service.
29. The testimony of four medical experts was heard in the trial of this case. Dr. Freeman and Dr. Veal (previously mentioned) appeared at the request of the plaintiff. Dr. Andrew G. Prandoni and Lt. Col. James A. Orbison, Medical Corps, United States Army, were called by the defendant. All four are specialists in vascular diseases.
30. Arteriosclerosis obliterans is a disease in which there is an increasing thickening of the walls of the larger blood vessels, resulting in an impaired flow of blood. It is a slow, progressive, chronic disease, with a relapsing course. Because of this characteristic of being so slowly progressive, it usually exists in the patient before symptoms are evident. Sometimes patients do not even know they have the disease and it is discovered in the course of physical examinations for other purposes. There can be an actual blocking, or occlusion of a branch vessel, but no sensing of symptoms because the patient has not engaged in physical exertion which has made demands on circulation in excess of the remaining capacity of the blood vessels. The physical effort expended by a patient may be comparatively large and still he will not sense symptoms of his condition of arteriosclerosis obliterans.
31. Thromboangiitis obliterans is also a vascular disorder, often referred to as Buerger’s disease. In both Buerger’s disease and in arteriosclerosis obliterans there is an impaired blood flow to the extremity, so the symptoms of each are often the same, cramping and pains in leg on walking and numbness of the toes and foot. Buerger’s disease is an in *666 flammatory ailment, affecting the smaller vessels, and is usually associated with the more rapid onset of gangrene. It occurs less frequently than arteriosclerosis obliterans, the latter outnumbering Buerger’s disease twenty to one. It is inclined to be more rapidly occlusive than arteriosclerosis obliterans. Unlike arteriosclerosis obliterans, Buerger’s disease is especially susceptible to aggravation by the use of tobacco. It progresses more rapidly than does arteriosclerosis obliterans. Because of the slowly progressive nature of arteriosclerosis obliterans, it will exist and be progressing many months or even years before symptoms are noticed. In Buerger’s disease the history is of shorter duration. The lapse of time between its onset and the manifestation of symptoms is less than that of arteriosclerosis obliterans.
Dr. Prandoni testified that the minimum period between the onset of Buerger’s disease and the manifestation of symptoms is no shorter than six months. Lt. Col. Orbison stated that the pathologic process of the disease antedates the occurrence of symptoms by a few months. Dr. Freeman stated that the onset of Buerger’s disease was more frequently insidious and slow, but rarely it may be abrupt.
32. The moving of a person from a hot to a cold climate is frequently the way in which symptoms of vascular diseases are detected for the first time. The coldness has a constricting effect on the blood vessels, making less blood available to the extremity, whereas in the warmer climate, the caliber of the vessel increases and more blood reaches that part of the body. The constriction due to the coldness results in an awareness for the first time of symptoms of a vascular disorder. Although this is the initial appearance of the symptoms, the disease has been present for sometime prior thereto. The unilateral coldness of the right foot which plaintiff experienced in Australia in April or May 1942 was evidence of impaired circulation of that part of the body, and could reasonably be interpreted as the first symptom of a pre-existing disease.
33. The symptom of unilateral coldness of the right foot in April or May 1942, along with the other symptoms occurring at that time could be interpreted as symptoms of arteriosclerosis obliterans. Dr. Prandoni stated that he doubted very much that any vascular disease short of em- *667 bolic occlusion, or sudden catastrophic occlusion of an artery could produce such symptoms within the short timé after plaintiff’s entrance upon duty. He further. testified that neither of the chronic diseases, thromboangiitis obliterans or arteriosclerosis obliterans, would produce symptoms in that short a period of time.
34. The term “acute coronary thrombosis” refers to a sudden occlusion of one of the major coronary arteries by a blood clot, which ultimately leads to a condition known as acute myocardial infarction. The arterial thrombosis which occurs as part of the natural progress of the disease of arteriosclerosis is not analogous to acute coronary thrombosis. Sometimes, in the course of the disease of arteriosclerosis obliterans there are sudden arterial thromboses or sudden arterial occlusions which are similar to an acute coronary thrombosis. In such a situation, the tissue supplied by that artery dies. If this occurs in the periphery, the muscle supplied blood by the artery dies, and gangrene sets in. There was no evidence of such an event occurring to plaintiff while he was in the military service. In 1951, following the first operation by Dr. Freeman, a sudden arterial thrombosis developed, but due to the second operation the leg was saved.
On the other hand, in the case of angina pectoris due to arteriosclerosis obliterans, there frequently is evidence of thromboses to the smaller coronary arteries. These thromboses are part of the natural progress of the disease known as angina pectoris. Such thromboses, absent evidence of myocardial infarction, are not embraced in the term “acute coronary thrombosis.” The thromboses which occur as part of the natural progress of the disease of arteriosclerosis ob-literans are more analogous to the changes that occur in connection with angina pectoris than to an acute coronary thrombosis.
35. Dr. Prandoni diagnosed plaintiff’s disease as arteriosclerosis obliterans when he first examined plaintiff in 1952. Lt. Col. Orbison testified that he believed that this was the disease from which plaintiff was suffering, and that he had reached this opinion before he knew of Dr. Prandoni’s examination. Dr. Freeman testified that he had, in 1951, diagnosed it as Buerger’s disease but that, at the time of his *668 testimony in 1953, he was of the opinion that it was arteriosclerosis obliterans. Dr. Veal testified that his statement to the Army Disability Eeview Board in 1951 that plaintiff had Buerger’s disease was a “presumptive diagnosis” but that, at the time he testified in 1954, he was not certain which it was.
36. Dr. Prandoni and Lt. Col. Orbison both testified that plaintiff’s ailment, arteriosclerosis obliterans, followed the normal, natural progress of that disease during the time of his service in the Army, and that the progress of the disease was minimal, as opposed to moderate or marked.
Lt. Col. Orbison further testified that had the plaintiff’s ailment been Buerger’s disease, it would have been a very slowly progressive type, and that the onset would have occurred prior to entrance on military duty. He stated that he found no indication in the medical history of the case that the plaintiff’s condition was permanently aggravated by military service, and that the progress would have been the same whether he was in or out of military service.
Dr. Veal testified that he was not sure whether the plaintiff had arteriosclerosis obliterans or Buerger’s disease, that the only positive means of diagnosis was to make a microscopic study of a section of the diseased blood vessel, that the plaintiff could have had a mild form of circulatory ailment which would have gone unnoticed at the time of his examination for entrance on active duty, that the minor ankle injury sustained in February 1942 might have produced a vasospasm and aggravated any existing condition in his vessels, and that combat conditions would materially aggravate a disorder of impaired circulation of the extremities. He stated that there was “partial support”, but not conclusive evidence, in the record of the Army Disability Eeview Board for the view that the incapacity of the plaintiff was not an incident of his military service, or that the cause of incapacity had not been permanently aggravated by military service. He testified that there was not a “normal course” of progress of circulatory ailments, but there was variation from one individual to another.
Dr. Freeman, on direct examination, testified that it was his opinion that the plaintiff’s circulatory ailment had its *669 onset while the plaintiff was in the military service. It was his understanding from the history given to him by the plaintiff that the first symptoms occurred in 1943, about a year after entrance on active duty. He had not seen the medical records of the plaintiff, which were part of the record before the Army Disability Review Board. Upon having read to him the clinical report contained in Finding 9, Dr. Freeman stated that the symptoms of pain for the period of several weeks after the plaintiff’s injury to his ankle or foot might well have been due to that injury, that the first recognizable evidence of any circulatory disturbance is contained in the note that his foot was cold in the cold weather in Australia several months later. He further stated that the underlying pathological basis for the process might well have been going on for a long period of time, and then there was superimposed an acute pathological process, namely, a block of an artery which produced the first symptoms. He further stated that when he first saw the plaintiff in December 1950, his circulation certainly did not show marked impairment for having had a process as long as eight years, and that in his opinion there had not been a very rapid rate of development.
Dr. Prandoni, whose experience included over a hundred cases of Buerger’s disease and almost a thousand cases of arteriosclerosis obliterans, testified that he could find nothing in reviewing the records of this case which would indicate that the plaintiff’s disease was permanently aggravated by his military service.
37. The findings and conclusion of the majority members of the Army Disability Review Board were supported by substantial evidence and were in accord with well established medical principles. They were not arbitrary, capricious, unreasonable, or made in bad faith.
38. Army Regulation No. 40-1025, December 12, 1944, in full force and effect at the time of plaintiff’s release from active military service, provides in pertinent part as follows:
63 * * * Lacking evidence to the contrary, a disease or injury of a militarized person will be presumed to have been service-connected, and, therefore, in line of duty. This presumption applies not only to a disease *670 or injury connected with the individual’s status as a soldier, but also to a disease or injury resulting from the individual’s performance of any of the usual duties or activities incident to everyday life (not inconsistent with his status as a soldier), or resulting from the individual’s outside activities, when such activities are authorized or encouraged by the War Department.
«I* »t» V
g: * * * (2) Basic provision — Irrespective of length of service, an Army patient will be presumed to have been in sound condition, upon entering active service, unless the disease or injury, or the conditions which brought about the disease, injury, or death, were noted on the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((>3) below) demonstrates that the injury or disease, or the conditions which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service, further, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well established medical principles, are able to overcome the presumption of service aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. (It will be borne in mind that in determining line of duty with respect to eligibility for retirement benefits, the incapacity, whether resulting from a condition incident to service, or from a condition that existed prior to service but aggravated by the service beyond the “natural progress” of the condition, must be permanent; that is, the incapacity -caused by the condition must be such that the removal of the disability within a reasonable time is highly improbable; see ÁR 605-250 and AN 615-395.)
(3) Clear and unmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. Discovery of residual conditions, however, such as scars, healed fractures, absent or resected parts of organs, supernumerary parts, congenital malformations, or fibrosis evidencing formerly active tuberculosis, is convincing enough to impel the conclusion that these conditions existed prior to the patient’s entrance into active service, without further proof, provided there is no evi *671 dence of active injury or disease during service. Manifestation of lesions or symptoms of- chronic disease,_ so close to the date of the patient’s entrance into active service, that the disease could not have originated in so short a period, will be accepted as clear and unmistakable evidence that the disease existed prior to active service. * * *
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish increase in disability; however, if such treatment was necessitated by increase in severity of preexisting conditions, then such disability will be considered as service-aggravated, unless the condition was improved by such treatment. Discovered healed residuals of a former injury or disease, without evidence of active pathology during service, will not be regarded as increase in disability. Similarly, mere recurrence of certain diseases within a short period after the patient’s entrance into active service, such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish increase in the degree of disability. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances (except hyperthyroidism or diabetes mel-litus), epilepsy, arteriosclerosis and hypertrophic (degenerative) arthritis, commonly designated as osteoarthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not incident to or aggravated by service. On the other hand, advancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and bronchial asthma (not established as seasonal) can be expected to have been caused by exertion, exposure, or other adverse influence of the military service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemop-tysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion or thrombosis, cerebral *672 hemorrhage, occurring while in service, will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and his petition is therefore dismissed.